Lester **SHAVER**, Appellant,

v.

Mabry J. **BROCK**, Appellee.

No. 07–89–0362–CV.

Court of Appeals of Texas,
Amarillo.

Nov. 30, 1990.

Rehearing Overruled Jan. 9, 1991.

Crenshaw, Dupree & Milam, Cecil Kuhne, Elata Ely, Lubbock, for appellant.

Donald M. Hunt, Lubbock, for appellee.

Before REYNOLDS, C.J., and DODSON and POFF, JJ.

REYNOLDS, Chief Justice.

Lester Shaver appeals from a judgment awarding Mabry J. Brock damages and prejudgment interest for Shaver's failure

to consummate an agreement to purchase stock of a bank holding company. Agreeing with Shaver's fourth of seven points of error, by which he contends that the evidence is insufficient to support the jury's answer to a controlling question, we will reverse and remand.

On 27 January 1986,[1] Brock and Shaver executed a stock purchase agreement by which Shaver agreed to purchase from Brock 37,500 shares of stock of Independent Financial, Inc., a bank holding company whose sole bank was Whisperwood National Bank, and to assume all indebtedness for which Brock was liable on trustee stock in the bank. Recognizing the possibility that the transaction might constitute a transfer of control of the bank and necessitate approval by the appropriate regulatory authority, the parties included the following provision in their contract:

7. *Approval of Regulatory Authorities:*

The parties understand that the consummation of this transaction may be subject to approval of the comptroller of currency or other regulatory authorities, and in the event that such approval is required or deemed to be required by the Buyer [Shaver], then the Buyer shall promptly apply for such approval and diligently pursue the approval after the filing of the application.... If no such approval can be obtained, through no fault of the Buyer, before May 1, 1986, then this contract may be canceled by either party, and in such event, neither party shall have any further responsibility hereunder.

A month after execution of the agreement, on February 26, Shaver applied to the Federal Reserve Bank for the necessary approval of the proposed change of control.

Thereafter, Shaver supplemented his notice-of-change-of-control application on March 20 and, on March 31, the Federal Reserve Bank asked Shaver for further information to be submitted by April 14. Responding, Shaver requested an extension of the deadline until April 21 to accommodate a vacation he had scheduled, and sup-

plied the additional information on April 25. Subsequently, on May 2, Shaver again supplemented his application.

Obviously, the approval of the Federal Reserve Bank had not been obtained by the first day of May. However, by letter dated May 6, the Federal Reserve Bank notified Shaver that his notice application was substantially complete on April 28, and that the acquisition might be completed on or after June 27 unless he was notified that the acquisition had been disapproved, the period for disapproval had been extended, or that the transaction might be accomplished at an earlier date.

On June 9, Shaver notified Brock's attorney that he intended to exercise his option to cancel the contract. Two days later, on June 11, Shaver notified the Federal Reserve Bank of changes in the condition of the bank and that he was "in dispute over the value of the stock described in the purchase agreement," leading the Bank to cease processing the notice of change in control.

Answering Brock's suit alleging that he, Shaver, failed and refused "to consummate [the] transaction under conditions which were not excused by the terms of the contract," Shaver defended, in part, on the ground that approval by the necessary regulatory authorities by May 1 was a condition precedent to Brock's right of recovery. Brock responded that Shaver had waived, and was estopped from claiming, such right to cancel.

The jury found that Shaver had not waived nor was he estopped from asserting his defense, *i.e.*, his right to cancel the contract. Notwithstanding, the jury, in effect, refused to credit that defense by finding, with their answers to questions three and four, that Shaver did not promptly apply for and diligently pursue regulatory approval, and that, had he done so, he would have obtained approval by May 1. Accepting the verdict, the court rendered judgment for Brock.

---

1. Unless otherwise indicated, all dates recited hereafter are in the calendar year 1986.

On appeal, Shaver initially contends, with his first two points of error, that the court erred in refusing to disregard the jury's answers to questions three and four because they were not ultimate issues, and in refusing to render judgment for him on the basis of the jury's answers to questions one and two. The points are overruled, for, on the record before us, questions three and four submitted the controlling issues, and the jury's answers to questions one and two did not control the right of cancellation provided for in the contract.

In this regard, the controlling contractual phrase is: "*If* no such approval can be obtained, through no fault of the Buyer, before May 1, 1986, then this contract may be canceled by either party...." (Emphasis added.) By their use of the term "if," the parties evinced their clear intention that this provision be a condition precedent rather than a covenant. *Criswell v. European Crossroads S. Ctr.*, 792 S.W.2d 945, 948 (Tex.1990); *Schwarz–Jordan, Inc. v. Delisle Const. Co.*, 569 S.W.2d 878, 881 (Tex.1978).

The condition was enunciated as the precedent to cancellation of the contract, thereby establishing what a party must show to demonstrate his right to cancel and escape liability, *i.e.*, that (1) approval could not be obtained by the target date, and (2) the failure to obtain approval by that date did not occur through the fault of the Buyer. Conversely, a party seeking to establish a right to recover for nonperformance must demonstrate the condition precedent could have been fulfilled, *i.e.*, that (1) regulatory approval could have been obtained by May 1, and (2) the failure to obtain such approval occurred through the fault of the Buyer.[2]

By their unchallenged finding to question number three, the jury found fault on the part of Shaver in that he failed to promptly apply for and diligently pursue approval. However, if due diligence could not have produced timely approval, then its absence does not satisfy both prongs of the condition precedent or establish "fault" on the part of the buyer. Therefore, a favorable finding to question four, secured by sufficient evidence of probative value, is essential to establish Brock's right to recover for nonperformance.

With his points of error three and four, Shaver challenges the jury's question-four finding that if he had promptly applied for and diligently pursued the approval of the notice of change of control, he would have obtained approval from the Federal Reserve Bank by May 1. His challenges are that there is no evidence and insufficient evidence to support the jury's finding.

In reviewing the no evidence point, we must consider only that evidence and inferences drawn therefrom tending to support the jury's finding, disregarding all evidence and inferences to the contrary. *King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985). In reviewing the insufficient evidence point, we must consider and weigh all of the evidence, including any evidence contrary to the jury's finding. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). If the no evidence point is sustained because there is no evidence of probative force to support the jury's finding, the finding is disregarded and judgment is rendered for Shaver unless the interests of justice require another trial. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If the no evidence point is overruled, and the insufficient evidence point is sustained because the evidence supporting the finding is so weak, or the evidence to the contrary is so overwhelming, that the finding should be set aside, the finding is disregarded, the judg-

2. We note that jury question number four appears initially to have been phrased "could" and was later marked over in ink to read "would." In this connection, Shaver argues that even if the record contains evidence that approval *could* have been obtained by the target date, there is no evidence to show that it *would* have been obtained, since that would require the proving of a certainty instead of a possibility. However, we observe that both "can" and "will" may be used to denote ability, Webster's II New Riverside University Dictionary 223, 1319 (1984); The Random House College Dictionary, Revised Edition 196, 1506 (1st ed. 1984), and that in common usage, these words and their past tense forms, "could" and "would," are sometimes used interchangeably.

ment is reversed, and a new trial is ordered. *Id.*

The Change in Bank Control Act of 1978 provides in part:

"No person ... shall acquire control of any insured depository institution through a purchase ... of voting stock ... unless the appropriate Federal banking agency has been given sixty days' prior written notice of such proposed acquisition and within that time period the agency has not issued a notice disapproving the proposed acquisition....

\* \* \* \* \* \*

An acquisition may be made prior to expiration of the disapproval period if the agency issues written notice of its intent not to disapprove the action."

12 U.S.C.A. § 1817(j)(1) (West 1989). The statutory language manifests that the regulatory authority does not affirmatively approve a proposed acquisition; rather, a proposed acquisition can be consummated only upon the expiration of the 60–day disapproval period in the absence of a notice of disapproval by the regulatory authority, or sooner upon notice of the regulatory authority's intent not to disapprove the acquisition.

Then, by operation of the statute upon the parties' agreement pursuant to the Federal Reserve Bank's May 6 notification, the "approval" by regulatory authorities specified by the parties for the acquisition would occur on June 27 in the absence of disapproval or further action by the Federal Reserve Bank.[3] Proof that disapproval would not have issued during the 60–day disapproval period was offered by the testimony of Mark Haney, called by Brock as an expert witness in the field of banking law, who stated that Shaver's transaction would eventually have been approved. The testimony was bolstered by the fact that no disapproval had been issued as of June 11 when Shaver notified the Federal Reserve Bank of the changes in the bank's condition, leading the Bank to cease processing the notice.

Considering this to be evidence of eventual "approval," there remains the question whether there was some evidence to show that had Shaver exercised due diligence, the approval would have been obtained within the 93–day period between the execution of the contract and the target date. It is recorded that the Federal Reserve Bank issued its May 6 notification of the June 27 acquisition date eight days after it considered Shaver's notice application to be substantially complete and four days after his last supplementation. A logical inference is that had Shaver submitted a substantially complete notice application not later than February 7, the Federal Reserve Bank would have issued its notification of an acquisition date predating May 1. Consequently, there is some evidence of probative force to support the jury's question-four finding. Shaver's third point of error is overruled.

However, after considering and weighing all of the evidence, we conclude that the evidence supporting the finding is so weak, and the contrary evidence is so overwhelming, that the finding must be set aside. Weighted against the evidence detailed above is Haney's testimony that typically, once the notice application is filed, the Federal Reserve Bank will request different supplemental information, that the supplementation required from Shaver was not due to his having filled out his notice application improperly or incompletely, that the 60–day waiting period was normal, and that there was little or nothing an applicant could do to expedite the process.

By computation, it is established that 61 days passed from the time Shaver submitted his application on February 26 until it was substantially complete on April 28. Adding the 60–day disapproval period fixed by the Federal Reserve Bank before the transaction could be consummated, a total of 121 days were required to secure the "approval" for which the parties had allowed only 93 days. Even assuming, *arguendo*, that due diligence required Shaver

---

**3.** We notice that neither party has contended the agreement is ambiguous; thus, whether the parties intended a notice from the Federal Reserve Bank that the 60–day waiting period had begun to run would constitute approval is a question of fact that is not before us.

to submit his notice of change of control on the same date the purchase agreement was executed, and to forego the delay of 11 days for supplementation occasioned by his vacation, the approval still would not have been received before the deadline. Under that scenario, 110 days would have been required to obtain the final approval for which the parties allowed 93 days. In either event, the established time frames clearly preponderate against a finding that Shaver would have obtained approval by May 1.

Additionally, the record reveals that James Ratliff, who had previous experience in operating a bank and undergoing Federal Reserve Bank scrutiny as both a purchaser and seller of a controlling interest in bank stock, subsequently purchased the shares of stock that were the subject of the Brock–Shaver contract. Utilizing the services of the same attorneys who represented Shaver, Ratliff began preparation of his notice application on September 5. He experienced a time lag of 80 days from its submission on October 20, with later requests for supplementation of information testified to be essentially the same as those previously received by Shaver, until 9 January 1987, when the Federal Reserve Bank issued its notice of intent not to disapprove his acquisition. Had Ratliff been subjected to the 60–day disapproval period imposed on Shaver, his transaction would not have been consummated until 140 days had elapsed after he first submitted his notice application.

Given the time frames shown, it follows that the evidence supporting the jury's question-four finding is so weak, and the contrary evidence is so overwhelming, that the finding must be set aside. Shaver's fourth point of error is sustained.

Sustaining the point requires a reversal of the trial court's judgment. It, therefore, is unnecessary that we address Shaver's remaining points by which he complains of the court's failure to grant him a new trial and the court's award of prejudgment interest. Tex.R.App.P. 90(a).

Accordingly, the judgment is reversed, and this cause is remanded to the trial court.