**Lester SHAVER, Appellant,**

v.

**Robert Glen SCHUSTER, Appellee.**

**No. 07–90–0023–V.**

Court of Appeals of Texas,
Amarillo.

Aug. 26, 1991.

Rehearing Overruled Oct. 1, 1991.

Crenshaw, Dupree & Milam, Cecil Kuhne, Elata Ely, Lubbock, for appellant.

Carr, Evans, Fouts & Hunt, Donald M. Hunt, Lubbock, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

Lester Shaver perfected this appeal from a judgment, rendered on a jury's verdict, awarding Robert Glen Schuster damages and prejudgment interest for Shaver's failure to consummate an agreement to purchase stock of a bank holding company. With sixteen points of error, Shaver attacks, in brief, the trial court's denying his motion for judgment non obstante veredicto, permitting Schuster to file a trial amendment after trial, and requiring him to protect Schuster from a contingent liability; the submission of issues; and the evidential support for the jury's findings. On the rationale expressed, we will overrule the points of error and affirm.

To purchase the shares of stock of Whisperwood National Bank, Independent Financial, Inc., a one-bank holding company, borrowed funds from First State Bank, Abilene, evidenced by its note guaranteed by its shareholders, including Schuster. Also, two trustees, Mabry Brock and Lonnie Hollingsworth, held, as "trust" stock for certain shareholders, shares of the holding company's stock purchased from former shareholders with funds borrowed from the Abilene bank, an indebtedness for which Schuster was also liable.

In 1985, the deteriorating condition of Whisperwood produced irreconcilable differences among members of the board of directors concerning operations. It was deemed necessary for one group to purchase the interests of the other in order to implement a solution.

Director Lonnie Hollingsworth made the initial proposal to purchase the stock of the opposing directors. Shaver, a shareholder and member of the board, was interested in purchasing a controlling interest. Schuster asked that his shares in the holding company be purchased so he could retire from the company.

Shaver and Schuster, both of whom possessed wide business experience, reached a private arrangement. Shaver would "purchase" Schuster's 37,500 shares for $7.28 per share, a total of $273,000, the initial offering price to Hollingsworth. Schuster would also convey his beneficial interest in 8,122 shares of the "trust" stock in consideration for Shaver's assumption of Schuster's liability on the trust shares and on the guaranty of the holding company's debt. If the sale to Hollingsworth were completed at a higher price, Shaver would reap the profit; if completed at a lower price, Schuster would bear the loss. If the sale to Hollingsworth were stymied, Shaver would purchase Hollingsworth's shares of stock and that of the other offerors.

Schuster and directors Irvin Skibell, Monte Hasie, and Ronnie Paulger, offered their shares of stock to Hollingsworth. Accepting and providing a $100,000 deposit, Hollingsworth later requested to be released from his obligation and to be refunded his deposit. Schuster opposed the release and refund, but Shaver persuaded him to relent, assuring him that if he would cooperate on the release and refund, he, Shaver, would buy his stock.

Schuster wanted to complete his sale before the end of the year for tax reasons. Shaver proposed giving Schuster a promissory note dated 1985 as consideration for

the sale, repeatedly assuring Schuster he should consider his stock sold.

Shaver's acquisition of a controlling interest involved the purchase of stock from Hollingsworth, Schuster, and at least one other shareholder, Mabry Brock. Shaver decided that if he could not purchase Hollingsworth's stock before that of the others, he would not complete the proposed transactions. Schuster agreed to Hollingsworth's stock being purchased first. The purchase increased Shaver's stock ownership to a percentage which triggered the requirement of regulatory review by the Federal Reserve Bank of subsequent purchases.

Schuster's accountant informed him that tax considerations mandated documentation showing the sale in December. He submitted a written agreement to Shaver who refused to sign it, saying he wanted to think about it and draw up the note himself. In the early part of 1986,[1] Shaver presented to Schuster, who accepted, a signed promissory note dated December 31, 1985, reading as follows:

### PROMISSORY NOTE

December 31, 1985

I, LESTER SHAVER, promise to pay to ROBERT GLEN SCHUSTER the sum of TWO HUNDRED SEVENTY–THREE THOUSAND AND NO/100 DOLLARS ($273,000.00) plus accrued interest from date at the rate of nine percent (9%) per annum. The entire principal balance plus accrued interest is due and payable in full on or before April 1, 1986.

However, this note is given contingent upon the following:

1) The presentation of 37,500 unencumbered shares of stock in Independent Financial, Inc.;

2) The approval of this transaction by [various members of the control group of shareholders];

3) If applicable, the approval of the federal regulatory authorities having jurisdiction.

It is further understood that this note will be paid in full at the earliest date that all the above contingencies are met. If said contingencies cannot be met, this note shall become null and void, and the parties hereto shall renegotiate.

/s/ Lester Shaver
Lester Shaver

On January 27, Shaver and Mabry Brock executed a stock purchase agreement containing a May 1 deadline for regulatory approval.[2]

Shaver, elected as chairman of the board of directors in January, submitted his notice of change in control of the holding company to the Federal Reserve Bank on February 20. In response to the FRB's requests for further information on March 6 and March 31, Shaver supplemented the information in his application on March 20, April 25, and May 2. Throughout this process and continuing after April 1, Shaver sent Schuster copies of correspondence with the FRB to inform him of any progress.

By his April 3 letter, Shaver, enclosing a copy of the FRB's March 31 letter, informed Schuster that he would send the information requested as soon as possible and would keep him posted on the status of the application. Acting on Schuster's suggestion that he hire a named firm of lawyers to expedite the application, Shaver did so shortly after April 1. He readily agreed that he was still pursuing the application, wanted to get the FRB's approval, and thought he "had a deal" with Schuster and Brock.

By a letter dated May 6, the FRB notified Shaver that his application was substantially complete. He was also advised that he could complete his proposal on or after June 27 unless the FRB's analysis of the information resulted in notification that the acquisition has been disapproved, the

1. All dates referred to herein will be in 1986 unless otherwise noted.

2. The Shaver–Brock transaction is recorded in *Shaver v. Brock,* 800 S.W.2d 657 (Tex.App.—Amarillo 1990, writ denied).

period for disapproval has been extended, or that the transaction may be accomplished at an earlier date.

On May 23, Shaver wrote, but upon advice of his attorney did not mail, a letter to the FRB informing it of the resignation of Whisperwood's president, his own decision not to consummate a purchase agreement with Mabry Brock, and his uncertainty concerning his obligations under the promissory note to Schuster. Instead, on June 3rd, Shaver's attorney mailed a letter to the FRB reassuring it of Shaver's commitment to service and terminate Financial Independent's debt.

Later, Shaver decided he had paid too much for the stock and he needed to "kill the deal." By letter dated June 11th, Shaver informed the FRB of the resignation of Whisperwood's president and his own dispute with Brock over the value of the stock covered by their purchase agreement. No mention was made of his transaction with Schuster. By letter dated June 27, the FRB notified Shaver it had ceased to process his notice of change in control of the holding company and that the proposal may not be completed.

Throughout the period before and after the April 1st due date of the promissory note, Schuster and Shaver saw each other at directors' meetings and at the bank on occasions when they were conducting their separate business there. On none of these occasions did Shaver remind Schuster that if regulatory review was not completed by April 1 their agreement would expire, nor did he inform Schuster that after April 1 "we don't have a deal."

Sometime after June 11, Schuster was given a copy of Shaver's letter of that date to the FRB. Also in early or middle June, following another disagreement during a directors' meeting, Shaver was asked by a director whether he was going to complete the stock purchase and replied he would not. Schuster approached Shaver afterwards and asked if there was some way they could "work this thing out." Shaver replied he would not buy Schuster's stock at any price and left.

Alleging the continuing force of their agreement until Shaver breached it in mid-June, Schuster sought to hold Shaver liable for breach of contract by failing to pay the promissory note. After the close of evidence, Schuster secured permission to file a dictated trial amendment, later reduced to writing, to allege the note was ambiguous with respect to any time limitation for the fulfillment of the contingencies set forth therein.

As the cause was positioned, Schuster persuaded the jury to return a favorable verdict composed of the summarized findings, corresponding to the numbered questions submitted, that:

(1) Shaver would have received approval by the FRB if he had pursued it with reasonable diligence until either approved or disapproved;

(2) the parties intended the agreement would remain in effect until the approval of the FRB was either obtained or refused;

(3) Shaver waived his right, if any, to require that the approval of the federal regulatory authorities be obtained by April 1;

(4) Shaver breached the agreement between the parties on June 15;

(5) The fair market value of the 37,500 shares of stock of Independent Financial, Inc. on the date of the breach of the contact was $3.75 per share;

(6) The fair market value of Schuster's "trustee" shares of stock of Independent Financial, Inc. on the date of the breach of contract was $3.75 per share;

(7) The amount of indebtedness attributable to Schuster's "trustee" share of stock on the date of the breach of contract was $8.01 per share;

(8) The amount of damages proximately caused Schuster by Shaver's refusal to assume Schuster's obligation as guarantor on Independent Financial, Inc.'s note to First State Bank of Abilene was, to the extent the obligation resulted from the "trustee" stock, $86,980.

(9) Schuster's reasonable attorney's fees were $20,000 for preparation and trial of the cause, $5,000 if the cause is

appealed to the court of appeals, $2,500 for making or responding to an application for writ of error in the Supreme Court, and $2,500 if the application is granted by the Supreme Court.

Overruling Shaver's motion for judgment non obstante veredicto, the trial court rendered judgment decreeing Schuster's recovery from Shaver of $155,975.23 principal, $61,953.08 pre-judgment interest, and $30,000 attorney's fees. The court further decreed that Schuster recover from Shaver the sum of $86,920, to be placed in the registry of the court and applied toward the payment of Schuster's guaranty obligation, with the provision that any amount not required to discharge the obligation shall be returned to Shaver.

At the outset, it is to be noticed that both parties agree the promissory note is the written memorial of their transaction. And they further agree that the note complies with the requisites of the Statute of Frauds governing the sale of securities. *See* Tex. Bus. & Com.Code Ann. § 8.319(1) (Vernon Supp.1991).

■ Initially, Shaver charges the trial court with error in denying his motion for judgment non obstante veredicto. He was entitled to judgment n.o.v., Shaver submits, because the unambiguous agreement terminated by its own terms on April 1 since FRB's approval had not been obtained by that date and there was no subsequent written agreement to extend the time.[3] Conformably, Shaver contends with his second, third, and sixth points of error, that the court respectively erred in permitting Schuster to file the trial amendment alleging an ambiguity in the note, and in submitting questions 1 and 2, which were neither proper nor ultimate issues in the absence of a written extension agreement. Continuing with his fourth, fifth, seventh, and eighth points, he attacks the sufficiency of the evidence to support the submission of, and the jury's findings to, questions 1 and 2.

Schuster responds that the note unambiguously specifies April 1 as the payment date, but has no deadline for meeting the listed contingencies. The lack of a deadline for fulfilling the contingencies is not subject to Shaver's Statute of Frauds objection, he asserts, because his failure to affirmatively plead the statute waived it as a defense. *First National Bank in Dallas v. Zimmerman*, 442 S.W.2d 674, 676 (Tex. 1969). As a consequence, Schuster views the note as presenting a constructional problem and he proposes three possible constructions.

First, Schuster proposes the construction that the note has no deadline for meeting the contingencies, thereby prompting the submission of jury question 1, the finding to which eliminated Shaver's excuse for repudiation and imposed liability upon him. Second, Shaver proposes the note may be construed as being ambiguous, which calls for the submission of question 2 to the jury, whose finding eliminated Shaver's excuse for repudiation and imposed liability upon him. Third, Schuster proposes the note had an April 1 deadline to secure the approval of the regulatory authority, but by the finding to jury question 3, Shaver waived the deadline, thereby removing it as an excuse for nonpayment of the note.

■ In construing the promissory note, our primary objective is to ascertain and give effect to the true intention of the parties. To this end, we must examine the entire writing, seeking as best we can to harmonize and give effect to all the provisions in the instrument so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 157–58 (1951).

■ Ambiguity is a question of law, *Tuthill v. Southwestern Public Service Co.*, 614 S.W.2d 205, 211 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.), which is determined by applying established rules of interpretation to the instrument. Then, if only one reasonable meaning emerges, the instrument is not ambiguous; but, if it remains reasonably susceptible to more than one meaning, it is ambiguous. *Uni-*

---

**3.** The only contingency listed in the promissory note that was not fulfilled by April 1 was the third one, the approval of the federal regulatory authorities.

*versal C.I.T. Credit Corp. v. Daniel,* 243 S.W.2d at 157.

When the writing is unambiguous as a matter of law, effect will be given to the objective intention of the parties expressed within the writing, *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968), and extrinsic evidence of subjective intent is inadmissible and has no effect. *Lewis v. East Texas Finance Co.,* 136 Tex. 149, 146 S.W.2d 977, 980 (1941). However, when a document is ambiguous, parol evidence which is consistent with the writing is admissible to explain the ambiguity, but not to vary the document's terms. *Remington Rand, Inc. v. Sugarland Industries,* 137 Tex. 409, 153 S.W.2d 477, 483 (1941).

By application of these principles, the promissory note clearly creates an obligation by Shaver to pay, and a right in Schuster to receive, a sum of money on or before April 1 upon the completion of the three stated conditions; but, if the contingencies cannot be met, the note becomes null and void. Therefore, the objective intent expressed within the four corners of the note is the establishment of the April 1 deadline for the completion of the transaction. To accept Schuster's proposals that the note provides an April 1 final date for payment, but either does not set a deadline or leaves uncertain the deadline for meeting the conditions precedent, would nullify the contingent provisions, thereby violating a cardinal rule of construction to harmonize and give effect to all the provisions in the note. *Universal C.I.T. Credit Corp. v. Daniel,* 243 S.W.2d at 158.

Then, since the note is unambiguous, there was no occasion for the court to grant the trial amendment or to submit questions 1 and 2 to the jury. The immateriality of these matters is reason to, and we do, overrule Shaver's points of error two through eight. *Reed v. Buck,* 370 S.W.2d 867, 874 (Tex.1963).

It follows that Shaver was entitled to have his motion for judgment n.o.v. granted, unless, as Schuster contends and the jury agreed in answering question 3, Shaver waived his right to require FRB's ap-

proval be obtained by April 1. In this regard, Shaver uses his points nine, ten and eleven, to challenge both the submission of question 3 and the jury's finding of waiver.

Although Shaver maintains that the submission of question 3 was erroneous because any agreement to waive the April 1 deadline was required to be in writing by the Statute of Frauds, the statute does not bar parol evidence of waiver of strict performance or an agreement to extend the time of performance. *Gulf Production Co. v. Continental Oil Co.,* 139 Tex. 183, 164 S.W.2d 488, 491 (1942). Even where time is of the essence in the performance of a contract, strict performance may be waived by the party entitled to insist upon timely performance. *Puckett v. Hoover,* 146 Tex. 1, 202 S.W.2d 209, 212 (1947).

Waiver consists of "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming it." *Furr v. Hall,* 553 S.W.2d 666, 674 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.). One of waiver's essential elements is the existence of an opportunity for a choice between a relinquishment and the enforcement of the right in question. *Faubian v. Busch,* 240 S.W.2d 361, 366 (Tex. Civ.App.—Amarillo 1951, writ ref'd n.r.e.). Having the opportunity, a party may evidence waiver by conduct of such a nature as to mislead the opposite party into an honest belief that the waiver was intended or assented to. *Alford, Meroney & Co. v. Rowe,* 619 S.W.2d 210, 213 (Tex.Civ.App.— Amarillo 1981, writ ref'd n.r.e.).

Accordingly, absent a written agreement to waive the April 1 deadline for completion of the transaction, any waiver of the deadline by Shaver would occur only if he, with full knowledge of the material facts, did or refrained from doing something which was inconsistent with his right or his intention to rely upon the deadline. Whether he did so was a question of his intention as revealed by the reasonable inferences to be drawn from the facts, a fact issue for the jury's determination. *Ford v. Culbertson,* 158 Tex. 124, 308 S.W.2d 855, 865 (1958).

To these principles, Shaver adds, on the strength of *Longview Sav. & Loan Ass'n v. Nabours*, 673 S.W.2d 357 (Tex. App.—Texarkana 1984), *aff'd*, 700 S.W.2d 901 (Tex.1985), and *Smith v. McKnight*, 240 S.W.2d 368 (Tex.Civ.App.—Amarillo 1951, no writ), among other authorities, the rule that there can be no waiver of a right under a contract after it has expired by his own terms. He then urges that since the agreement by its own terms became "null and void" on April 1, there can be no waiver of its terms by virtue of Schuster's reliance on acts and events which occurred after the expiration date.

The rule recognized in *Nabours* and *Smith* is not universally applied, *see, e.g.*, *United States Fidelity & G. Co. v. Bimco Iron & M. Corp.*, 464 S.W.2d 353, 357 (Tex.1971), and is not applied where the acts establishing waiver constituted a course of conduct extending over a period of time before, during, and after the existence of the right waived. *Longview Sav. & Loan Ass'n v. Nabours*, 673 S.W.2d at 361. In this connection, the evidence before the jury for its determination of the factual issue of waiver does not include the transactional negotiations between the parties before they reduced their agreement to writing. *Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30, 32 (1958).

As trier of the fact issue of waiver, the jury was the judge of the credibility of the witnesses and the weight to be given their testimony. In so judging, the jury could believe any one witness and disbelieve other witnesses, resolve inconsistencies in the testimony of any witness as well as in the testimony of different witnesses, and arrive at the fact deemed most reliable under the evidence. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986).

From the evidence, the jury could reasonably believe that between February 20 and March 31, Shaver was actively pursuing the FRB's approval of his application without giving any indication he would exercise his right to stand on the agreement's April 1 termination date, particularly since, at Schuster's suggestion, he employed the firm of attorneys shortly after April 1 to expedite the approval and still thought he "had a deal." The jury was entitled to also believe that by Shaver's employment of the attorneys and his April 3 letter informing Schuster he would send the information requested in the FRB's March 31 letter as soon as possible and would keep Schuster informed, Shaver had relinquished his right to insist the agreement was terminated on April 1, and had engaged in intentional conduct inconsistent with claiming the right. The jury could logically validate its belief upon Shaver's subsequent actions of supplementing his application by information furnished the FRB on April 25 and May 2, together with his attorney's June 3 letter assuring the FRB of Shaver's commitment to serve and terminate Independent Financial, Inc.'s debt. Otherwise, why would he continue to seek the FRB's approval after April 1 and until June 11?

Shaver answers that, as he testified, he considered the agreement terminated on April 1, but he continued to seek the FRB's approval because he still had an obligation to purchase Brock's stock until May 1, and he felt he and Schuster could renegotiate the contract as provided in its last paragraph. Yet, the jury was not required to believe Shaver's testimony, *McGalliard v. Kuhlmann*, 722 S.W.2d at 697; instead, the jury could accept his actions as manifesting his intention more accurately than his later words.

Shaver's challenge to the legal sufficiency of the evidence to support the submission of, and the jury's finding to, question 3 is considered under the standard of review enunciated in *King v. Bauer*, 688 S.W.2d 845, 846 (Tex.1985), and his challenge to the factual sufficiency of the evidence to support the jury's finding is considered under the standard of review set forth in *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). Upon those considerations, Shaver's course of conduct extending over the period of time before, during, and after the April 1 deadline is some evidence of probative force to support both the submission of, and the jury's finding to, question 3; and we cannot say the evidence supporting the jury's finding is so weak, or the evidence to the contrary is so overwhelm-

ing, that the findings should be set aside. *Longview Sav. & Loan Ass'n v. Nabours,* 673 S.W.2d at 361. *Accord, Massachusetts Bond. & Ins. Co. v. Orkin Exterm. Co.,* 416 S.W.2d 396, 401–02 (Tex.1967); *Braugh v. Phillips,* 557 S.W.2d 155, 159–60 (Tex. Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.); *Atomic Fuel Extraction Corporation v. Slick's Estate,* 386 S.W.2d 180, 187 (Tex.Civ.App.—San Antonio 1964), *aff'd per curiam,* 403 S.W.2d 784 (Tex.1965); *Stevenson v. Adams,* 640 S.W.2d 681, 682–84 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). Shaver's points of error one, nine, ten, and eleven are overruled.

Shaver also challenges, with his points twelve and thirteen, the legal sufficiency of the evidence to support the submission of question 4 and the jury's finding thereto, as well as the factual sufficiency of the evidence to support the finding. His premise is that because the agreement terminated and expired by its own terms on April 1, it could not have been breached on the subsequent date. Since the premise is invalid under our prior holdings, the points must fall for the lack of a proper foundation. *Ladd v. Knowles,* 505 S.W.2d 662, 669 (Tex.Civ.App.—Amarillo 1974, writ ref'd n.r.e.). The points are overruled.

■ The jury, in answering question 8, found that $86,920 was the amount of damages caused Schuster by Shaver's refusal to assume Schuster's guaranty obligation. By his points fourteen and fifteen, Shaver presents the contentions that there is no evidence to support the submission of question 8, and no evidence and insufficient evidence to support the jury's finding thereon. He points to the evidence that Schuster sold his stock for $3.75 per share in September, 1986 to Jim Ratliff, who assumed the obligation Schuster had on his guaranty of the First State Bank, Abilene, acquisition note; that Schuster admitted he had only a contingent liability on the note and, so far, it had not cost him anything; and that at some time in the future, Schuster might have some liability on the note. Hence, Shaver says, there is no evidence that Schuster has sustained any damage

caused by his, Shaver's, refusal to assume Schuster's obligation on the note.

In addition to that evidence, however, there was evidence that in order to complete the sale of his 37,500 shares of stock to Ratliff, Schuster was required to pay $69,893.30 on the trust stock, which resulted in his becoming the owner of an additional 8,122 shares of stock and again liable on the guaranty of the $86,920 acquisition note. Ratliff's assumption of the liability associated with the 37,500 shares of stock did not include the guaranty liability connected with the 8,122 shares of stock Schuster acquired after he contracted with Ratliff. Although Schuster's reacquired liability was contingent, the recent failure of First State Bank, Abilene, passed the ownership of the note to Federal Deposit Insurance Corporation, which was demanding payment.

Thus, the application of the proper standards of review reveals the evidence not only was sufficient to support the submission of question 8, but it was sufficient to support the jury's finding. Points of error fourteen and fifteen are overruled.

■ With his last point, his sixteenth one, Shaver asserts the court erred in ordering him to pay $86,920 into the registry of the court to protect Schuster against some possible future contingent liability. The gist of his complaint is that since the court did not specify in the judgment a date for the return to him of the amount not required by Schuster to discharge his guaranty obligation, the judgment is too indefinite as to time and amount of money for him to levy execution upon it to preclude its dormancy after ten years. *See* Tex.Civ. Prac. & Rem.Code Ann. § 34.001(a) (Vernon 1986); *Williams v. Short,* 730 S.W.2d 98, 99–100 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.).

Obviously recognizing that the award of $86,920 damages to Schuster represented the maximum amount of his contingent liability, the court properly sought to prevent his double recovery by insuring that Shaver would pay no more than the actual liability imposed upon Schuster. *Mead v. Johnson Group, Inc.,* 615 S.W.2d 685, 689 (Tex. 1981). Accordingly, the court ordered the

$86,920 to be paid into the registry of the court, to be deposited in an interest bearing account, and to be applied toward the payment of Schuster's guaranty obligation upon certification of demand by the holder of the note, with the balance to be returned to Shaver when Schuster's obligation on the guaranty ceased.

The court's order was a proper one, decreeing disbursements upon the occurrence of future events rather than upon a date certain. *Hargrove v. Insurance Inv. Corporation*, 142 Tex. 111, 176 S.W.2d 744, 747–48 (1944). Without pausing to decide whether Shaver could be a judgment creditor in need of execution, it suffices to state that the funds in the registry of the court are held in trust for the litigants who establish a right to them, *Sellers v. Harris County*, 483 S.W.2d 242, 243 (Tex.1972), and nothing in the court's order impinges upon Shaver's entitlement to receive the funds to which he establishes his right. Indeed, the court may make such orders as may be necessary to enforce his right. Tex.R.Civ.P. 308; *Various Opportunities v. Sullivan Investments*, 677 S.W.2d 115, 118 (Tex.App.—Dallas 1984, no writ); *Reynolds v. Harrison*, 635 S.W.2d 845, 846 (Tex.App.—Tyler 1982, writ ref'd n.r.e.). The sixteenth point of error is overruled.

The judgment is affirmed.