NO. 07-01-0100-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

FEBRUARY 21, 2002
_____

HANCE, SCARBOROUGH, WRIGHT, GINSBERG & BRUSILOW, L.L.P.,
fka HANCE/SCARBOROUGH/WRIGHT, by and through
EDWARD W. CALLISON, JR. AND BECKY S. CALLISON,

Appellant

v.

AUBREY A. KINCAID,

Appellee
_____

FROM THE 46th DISTRICT COURT OF HARDEMAN COUNTY,
NO. 9203; HON. TOM NEELY, PRESIDING
_____

Before QUINN, REAVIS AND JOHNSON, J.J.

Hance, Scarborough, Wright, Ginsberg & Brusilow, L.L.P., (Hance) appeal from a

judgment awarding interpled funds to Aubrey A. Kincaid (Kincaid). The trial court allegedly

erred in awarding the entire fund to Kincaid because it incorrectly interpreted a promissory

note and failed to abide by applicable bankruptcy laws, contends Hance. We reverse.

### *Background*

The facts involved are not disputed. They reveal that on February 23, 1994,

Edward and Becky Callison (Callisons) purchased the Quanah Parker Inn (Inn) from

Quanah Hospitality Inns, Inc. (QHI) and executed a promissory note in the amount of $308,240.00 (QHI Note) payable to QHI. The QHI Note was secured by a deed of trust wherein James A. Showers (Showers) was named trustee. On same day, the Callisons sold the Inn to Robert and Laurie Wright (the Wrights). As part of that transaction, the Wrights executed a wraparound promissory note (the Wright Note) for $373,510.00, naming the Callisons and Kincaid payees. The Wright Note read, in pertinent part, as follows:

> For Value Received, we promise to pay to Edward W. Callison and . . . Becky S. Callison, and Aubrey Kincaid or order, the sum of Three hundred, seventy-three thousand five hundred ten and No/100 Dollars ($373,510.00), with interest form date at the rate of 10% per annum, both principal and interest payable at Quanah, Hardeman County, Texas.

> The principal and interest shall be due and payable in monthly installments of Four thousand and No/100 Dollars ($4000.00) or more each, payable on the 23rd day of each and every calendar month, beginning March 23,1994, and continuing regularly until the principal and interest have been paid in full . . . .

> The vendor's lien and deed of trust lien securing this note are subordinate, secondary and inferior to the vendor's lien and deed of trust lien securing the payment of the unpaid balance of that certain $308,240.00 indebtedness described in and secured by a deed of trust of even date . . . payable by Edward W. Callison and . . . Becky S. Callison, to [QHI] . . . the payment of which indebtedness the Makers hereof have not assumed but which the payees herein, as well as any other owner or holder of this note, are obligated to pay as and when due, and should default be made in the payment thereof, the undersigned Makers are accorded the right to cure such default and receive credit on this note . . . .

> This note, in the original principal sum of $373,510.00 as aforesaid, is payable to Aubrey Kincaid to the extent of $63,099.47, together with interest thereon at the rate specified. By their acceptance of this note, Edward . . . and . . . Becky . . . Callison[] acknowledge that the said Aubrey Kincaid is entitled to the proportionate payment from the proceeds of this note herein, to the said extent of $63,099.47, together with interest thereon as

2

hereinabove specified. The said Aubrey Kincaid, however, is not obligated or liable with respect to the aforesaid original promissory note in the amount of $308,240.00, and is not a party to said obligation, and the said parties acknowledge that Edward . . . and Becky . . . Callison, and Aubrey Kincaid have entered into a separate agreement of even date . . . reciting the considerations and conditions entitling the said Aubrey Kincaid to proportionate payment hereunder.

It is stipulated and agreed that the monthly payments of $4000.00 each to be made by Robert . . . and . . . Laurel Wright . . . shall be paid directly to [QHI] in accordance with instructions to be furnished in writing by the parties, until such time as the said payors are otherwise lawfully instructed in writing.

As revealed by the terms of the note, the Wrights also executed a deed of trust securing payment of the Wright Note. The beneficiaries named in the encumbrance were the Callisons and Kincaid.

Several years later, the Callisons filed for bankruptcy under Chapter 11 of title 11 of the United States Code. Hance expended effort in relation to the bankruptcy. The record does not describe the nature or extent of that relationship, however. Nevertheless, the firm made claim for $58,115.66, and it was granted the status of an administrative claim in the modified plan of reorganization.[1] Through that plan, the bankruptcy court ordered that the ". . . Fee Claims of [Hance] shall receive the following payments until such Professional Fee Claims are paid in-full."

1) monthly payments out of future operations in an amount to be agreed on with the Debtors; 2) the first Net Recoveries from the Retained Actions and any liquidations of the Quanah Note [or Wright Note], after associated costs, but prior to the payments of Net Recoveries to Priority Tax Claims, Unsecured Creditors and the Debtors, and; Net Recoveries from any sale of the Rodeway Inn Property, after payment of closing costs and after payment

---

[1]The firm of Burke, Wright & Keiffer, P.C., actually was awarded an administrative claim. Since that occurred, however, Hance subsequently acquired the interests of the Burke firm in the fee through merger or otherwise. So, for convenience and clarity, we refer to the Hance firm as the claimants at bar.

of Graham Savings, but prior to payment of Net Recoveries to Priority Tax Claims.

Thereafter, the Wright's defaulted upon their obligation represented in the Wright Note. The Callisons and Kincaid foreclosed upon the deed of trust securing the obligation and bought the property at the foreclosure sale for $372,500.00. In turn, the Callisons defaulted upon their indebtedness to QHI, and the latter foreclosed upon its deed of trust. At the latter sale, Kincaid purchased the property for $326,000.00. After payment of the outstanding debt and the deduction of expenses, the sum of $53,555.64 remained.[2] And, it was this sum which was interpled into the trial court's registry.

Upon initiation of the interpleader, Hance moved the bankruptcy court which originally entertained the Callison bankruptcy proceeding for an order directing that the interests of the Callisons in the funds be turned over to a receiver. The court granted same and entered an order declaring that "Bill Siegel, Esq., . . . shall be and hereby is appointed receiver . . . of the Callisons' interests, cause(s) and chose(s) of action in the Excess Funds . . . ." So too did it order that

> [1] the Receiver shall possess the sole and exclusive right to do any and all acts necessary to pursue the subject interest(s), cause(s) or chose(s) in action of the Callisons' in the Excess Funds on behalf of [Hance] and/or collect and receive any portion of the Excess Funds due pursuant thereto without further hearing, approval or order of [the bankrutpcy] Court [and]

> [2] the Callisons, shall be deemed to have turned over all interest(s), cause(s) of and chose(s) in action and all right, title and interest incident thereto to the Receiver, and that . . . the Callisons . . . shall turnover same

---

[2]The sum remaining originally consisted of $37,255.64. However, it was determined that the substitute trustee had waived his right to a fee of $16,300.00. So, that amount was added to the other for a total of $53,555.64.

and any and all settlements, replacements substitutions, products, or proceeds received concerning same to the Receiver, including any and [a]ll documents or records related thereto within ten (10) days from the date of this Order.

Pursuant to the status granted him via the turnover order, Siegel and Hance intervened and made claim to the interpled funds. Upon trial, however, the entire $53,555.64 was awarded to Kincaid.

### First Issue

Hance initially asserts that the trial court erred in denying it recovery. This is allegedly so because the trial court misconstrued the terms of the Wright Note. That is, Hance believes that to the extent Kincaid had an interest in the interpled funds, it mirrored his interest in the Wright Note. Furthermore, since Kincaid's percentage interest in the note equaled the ratio of $63,099.47 to $373,510.00 or 16.893%, the amount he should have received from the interpled funds was $9,047.15. We sustain the argument.

*Standard of Review*

Critical to our resolution of the argument is the interpretation of the Wright Note. Simply put, Kincaid may have been a payee of that note. However, it is clear that he was not entitled to the entire sum owed by the Wrights. This is evinced by those provisions of the instrument stating that 1) through the original sum of the note is $373,510.00, it nevertheless "is payable to Aubrey Kincaid to the *extent of $63,099.47*, together with interest thereon at the rate specified" and 2) "Edward . . . and . . . Becky . . . Callison[] acknowledge that . . . Kincaid is entitled to the *proportionate payment from the proceeds* of this note herein, to the said extent of $63,099.47, together with interest thereon as

5

hereinabove specified." (Emphasis added). So, our task is to decide the extent of Kincaid's interest in the Wright Note.[3] And, to this end, we acknowledge our obligation to abide by the rules governing the construction of contracts.[4]

Of those many rules, the first directs that construing an unambiguous contract involves a question of law.[5] *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex. App.-- Amarillo 1987, writ ref'd n.r.e.). And, because the question is one of law, we need not defer to any interpretation afforded it by the trial court. Second, the next rule requires us to give effect to the intent of the parties. *Id.* In doing so, we must strive to garner that intent from the language of the contract itself, as opposed to extraneous evidence. *Shaver v. Schuster*, 815 S.W.2d 818, 824 (Tex. App.--Amarillo 1991, no pet.). That is, we peruse the entire agreement to understand, harmonize, and effectuate all its provisions. *Questa Energy Corp. v. Vantage Point Energy, Inc.*, 887 S.W.2d 217, 221 (Tex. App.--Amarillo 1994, writ denied). So too must we afford the words contained in the document their plain, ordinary, and generally accepted meaning. *Sun Operating, Ltd. v. Holt*, 984 S.W.2d 277, 285 (Tex. App.--Amarillo 1998, pet. denied); *Phillips Petroleum Co. v. Gillman*, 593 S.W.2d 152, 154 (Tex. Civ. App.--Amarillo 1980, writ ref'd. n.r.e.).

---

[3]Though they disagree upon the percentage, the litigants nonetheless concede that whatever the percentage of interest Kincaid owned in the Wright Note represents the percentage of interest he owned in the interpled funds.

[4]A promissory note is nothing more than a contract evincing an obligation to pay money. As such, the construction of its terms is controlled by the rules generally applicable to interpreting contracts. *Amarillo Nat'l Bank v. Dilday*, 693 S.W.2d 38, 41 (Tex. App.--Amarillo 1985, no writ).

[5]No one contends that the terms of the Wright Note are ambiguous. Nor do we find them ambiguous. *See Shaver v. Schuster*, 815 S.W.2d 818, 824 (Tex. App.--Amarillo 1991, no pet.).

6

Finally, in applying the foregoing rules, we may not rewrite the agreement to mean something it did not say. *Borders v. KRLB, Inc.*, 727 S.W.2d at 359. That we or various of the parties may dislike its provisions or come to think that something else is needed matters not. *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888-89 (Tex. 1998). This is so because parties to a contract are free to select for themselves the terms and provisions explaining their respective obligations. And, because they select them, they are bound by their selection. For a court to change the agreement merely because it did not like it, or because one of the parties subsequently found it distasteful, would be to undermine not only the sanctity afforded the bond they created but also to risk undue governmental interference in commercial transactions. With this said, we now turn to the accord at bar.

*Application of Standard*

At the heart of the controversy before us lies the meaning of various pivotal phrases in the Wright Note. The particular phrases state that "Kincaid is entitled to the *proportionate payment* from the *proceeds* of this note herein, to the said extent of $63,099.47, together with interest . . ." and "to *proportionate payment* hereunder." (Emphasis added). On appeal, Kincaid suggests that they mean he is entitled to first payment of any funds remaining after the $308,240.00 debt to QHI is satisfied. He arrives at this premise by focusing on the words "proceeds of this note." In his view, the proceeds are the difference between the total sum the Wrights obligated themselves to pay ($373,510.00) minus the debt owed by the Callisons to QHI ($308,240.00). This must be so in his estimation because neither he nor the Callisons are entitled "to a single cent from the Wrights until QHI had been paid in full," and only after satisfaction of the QHI debt

7

"would the Wrights begin to make their $4,000.00 monthly payment to the payees," Kincaid and the Callisons. From there, he concludes that he is entitled to $63,099.47 of the remainder, that being his "proportionate payment."

Interestingly, the argument proffered by Kincaid here differs from that uttered below. For instance, when asked at trial whether his right to payment of the Wright Note "would have *only* come if [the QHI] . . . note and Deed of Trust had paid the motel debt off," he answered "[n]o, sir." (Emphasis added). So too was he questioned about his interest in the Wright Note. When asked if he "own[ed] $63,099.00 of the $373,000.00 note," his reply was "[p]lus interest." Hance later followed that question and answer by asking Kincaid whether on the date the Wright Note was executed, his "proportion of that note was sixty-three three seventy thirds." To this, Kincaid said: "I think that's right. I believe that's what the situation is." Following this query was one concerning the priorities of payment. That is, inquiry was made into whether the note specified the manner of payment between he and the Callisons. Initially, Kincaid stated that he did not know if the note said anything about whether he was to be paid first. Then, he 1) acknowledged that nothing other than what was in the note and deed of trust addressed "how any proportions" were to be paid, 2) "assume[d] that [the parties] spelled that out in a note," and 3) conceded that "the documents speak for themselves to who is owed what . . . ." Arguing before us that the QHI Note had to be paid first before anyone else could be paid hardly comports with his contention below that his "right to payment" did not ripen only after satisfaction of the QHI debt.

8

Nor does the terminology in the Wright Note support the contention Kincaid urges before us. Though the instrument specifies that the monthly payments of $4,000.00 were to be made to QHI, the Wrights were bound by that directive only until the parties (Kincaid and the Callisons) "otherwise lawfully instructed in writing." Furthermore, nothing in the instrument itself limited the ability of Kincaid or the Callisons to redirect the monthly payments to other recipients, including Kincaid and the Callisons. That the payments could be redirected away from QHI, fails to evince an intent on behalf of Kincaid or the Callisons that payment of the QHI debt was a prerequisite to their enjoyment of any proceeds from the Wright Note. Simply put, having the ability to redirect payment to themselves rebuts the notion that "the express terms of the Wright Note do not entitle either Kincaid or the Callisons to a single cent from the Wrights until QHI had been paid in full."

Similarly, absent from the Wright Note is language specifying that Kincaid was to receive priority over the Callisons when it came to payment. At best, the instrument discloses that he is to simply receive a "proportionate" share of the "proceeds" up to $63,099.00 plus interest. Moreover, "proportionate" connotes "being in proportion" or being a "part considered in relation to the whole," THE AMERICAN HERITAGE DICTIONARY, 1049 (New Coll. Ed. 1976), or "the relation of one part to another or the whole with respect to magnitude, quantity or degree . . . ratio." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1819 (1993). In other words, a proportionate part of something means the size of the claimant's share in relation to the whole. It has nothing to do with priorities among the shares of the claimants. And, nothing in the instruments themselves urge otherwise.

9

So, unless we ignore the rule of construction obligating us to afford words their plain meaning, we cannot hold that the phrase "proportionate payment" evinces an intent to prioritize the right of Kincaid to payment over that of the Callisons.

Next, in determining what was meant by "proportionate payment," we again turn to the language incorporated into the Wright Note. In the latter, the parties expressed that the "original principal sum" of the instrument was $373,510.00. So too did they specify that "the note" (having such an "original principal sum") was "payable to . . . Kincaid to the extent of $63,099.47," plus interest and that the Callisons "acknowledged that . . . [he was] entitled to the proportionate payment from the *proceeds of this note* . . . ." (Emphasis added). As previously mentioned, Kincaid would have us believe that the "proceeds" alluded to equated the difference between the face amount of the Wright Note and the debt owed QHI. That difference approximated $65,000.00. So, his proportionate share of those proceeds was represented by the ratio of 63 (*i.e.*, $63,099.47) to 65 ($65,000.00).[6] The flaws in his logic, however, are several.

First, Kincaid conceded at trial that the elements comprising the ratio differed somewhat. He did not argue below that they consisted of 63 and 65. Rather, he acknowledged under cross examination that they were 63 to 373. This was so (as explained by Hance via his questioning) because the amount which the Wrights obligated themselves to pay was $373,510.00, not simply $65,000.00. Second, there could be no other correct answer given the terms of the note. This is so because the "note" was

---

[6]Accepting Kincaid's position would effectively leave the Callisons with an interest of only $2,000.00 in the $373,000.00 note.

10

payable to Kincaid to the extent of $63,099.47. And, in stating that the "note" was payable to Kincaid, the expressed language of the instrument falls short of evincing that the parties intended to mean that only $65,000.00 was payable to Kincaid up to $63,099.47. Any conclusion to the contrary would simply eviscerate that part of the note specifying that it had an "original principal sum" of $373,510.00.[7]

Third, while it may be that QHI was to receive the $4000.00 monthly payment, that obligation imposed upon the Wrights was dependent upon the directives of Kincaid and the Callison. As discussed above, nothing in the instrument barred either payee from altering that designation at will. And, to the extent that some other agreement may have done so, we cannot consider it given the rules applicable to construing an unambiguous document. So, the existence of this right to dictate and change the identity of the recipient of the monthly payments and the absence of any prohibition barring them from designating themselves as the recipient dispels the notion that the named payees were lawfully precluded from recovering more than $65,000 of the $373,510 "original principal sum."

---

[7]Indeed, the argument proffered by Kincaid likens to that rejected by the Supreme Court in *Summers v. Consol Capital Special Trust*, 783 S.W.2d 580 (Tex. 1989). There, the court was asked to determine whether a foreclosure via a deed of trust securing payment of a wrap-around note (like that at bar) resulted in a surplus or deficiency. In attempting to persuade the high court to affirm the intermediate court's decision, the debtor argued that the "true debt" was actually the difference between the face amount of the note it signed and the amount of the debt which was wrapped into the note. This was allegedly so because the note's payor was not liable for the underlying wrapped debt. However, the Supreme Court rejected the propostion for it ignored the fact that the payor obligated itself to pay the face amount of the note, not the difference between that sum and the amount of the wrapped debt. Like the debtor in *Summers*, Kincaid attempts to persuade us to ignore the amount of the obligation actually incurred by the Wrights. It was not the difference between the face amount of the note and the sum owed to QHI by the Callisons. It was the "original principal sum" of $373,510.00. And, to the extent that a note of that amount was payable to Kincaid (up to $63,099.47) his interest was in the $373,510.00, not the supposed "true debt" of $65,000.00. To hold otherwise would be to deviate from the teachings of *Summer*.

Nor can it be said that the plain meaning of the word "proceeds" connotes the difference between the "original principal sum" of the Wright Note and the amount of the QHI debt. One source defines it as "the net sum brought in after deduction of any discount or charges," the "total amount brought in," and "what is produced by or derived from something by way of total return." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1807. Another interprets it as meaning "profit" or "yield." THE AMERICAN HERITAGE DICTIONARY, 1043. Applying these meanings to it, we conclude that the "yield," "profit," or "total amount brought in" equaled $373,510.00, plus whatever interest the Wrights agreed to pay. This is so because that is the sum which the Wrights obligated themselves to pay, irrespective of who ultimately receives their payments. So too was that the sum which both the Callisons and Kincaid undoubtedly intended for the Wrights to pay. In other words, and unless the instrument were sold at a discount to some third money, the *total* amount of funds which the parties expected to be generated from by engaging in their commercial transaction (assuming the Wrights paid the note according to its terms) was $373,510.00, plus interest, not $65,000.00.

Similarly, had the Wrights defaulted upon the obligation, the payees would have been entitled to sue them to enforce the instrument. Furthermore, the amount of principal due and recoverable would have equaled $373,510.00, less any payments made to reduce the principal. The Wrights could not have rationally argued that the extent of the liability was merely $65,000.00 since that was the amount which would have been left if the QHI Note was first satisfied. Nor could we reasonably conceive of either the Callisons or Kincaid conceding that the extent of the debtors' liability under the note was merely

$65,000.00. And, because we could not so conceive of the payees doing so, we are precluded from holding that the "proceeds" of the note were $65,000.00 as opposed to the amount the Wrights obligated themselves to pay, *i.e.* $373,510.00.

In short, Kincaid's proportionate interest in the note and its proceeds equaled $63,099.47 of $373,510.00 or 16.893% of the note. Additionally, that percentage of ownership carried over into the land securing payment of the note once Kincaid and the Callisons foreclosed upon same.[8] And, it again represented Kincaid's percentage of ownership in the surplus funds remaining after QHI enforced its deed of trust encumbering the land, foreclosed upon said land, and used the proceeds garnered at the foreclosure sale to satisfy the debt due it. So, in awarding Kincaid more than his proportionate interest in the surplus, the trial court misconstrued the terms of the note and erred.

Accordingly, we reverse the judgment of the trial court and remand for further proceedings.[9]

---

[8]Generally, cotenants to whom property is conveyed are presumed to own equal shares. However, the presumption is rebuttable, and one can rebut same by showing, among other things, that each cotenant contributed an unequal amount towards its acquisition. This evinces an intent on the part of the contributors to own the realty in differing proportions. *Schroeder v. Todd*, 249 Iowa 139, 144, 86 N.W.2d 101, 104 (1957). With this in mind, we hold that Kincaid's proportionate interest in the surplus of the proceeds from the QHI foreclosure equals his interest in the Wright Note. This is so because the parties expressly limited his interest in that note, and the realty upon which QHI ultimately foreclosed was substituted for the note when the Callisons and Kincaid themselves foreclosed upon it. So, we have before us evidence rebutting the presumption of equal ownership.

[9]The Rules of Appellate Procedure generally grant us the authority to enter the judgment which the trial court should have entered. *See* TEX. R. APP. P. 43.2(c). However, the record illustrates that the bankruptcy court ordered the Callisons' interest in the surplus funds to be turned-over to a Bill Siegel, Esq., "on behalf of" Hance. Nothing of record reflects that this order has been modified in a way permitting delivery of the interest directly to Hance. Indeed, when a trustee is entitled to recoup funds, one does not pay them directly to the beneficiaries of the trust. Thus, we remand the cause to the trial court to have it determine to whom to pay the Callisons' interest.

13

Brian Quinn
Justice


Publish