James M. SUMMERS, Trustee and English Village Apartments, Ltd.,
Petitioners,

v.

CONSOLIDATED CAPITAL SPECIAL TRUST, Respondent.

No. C–6817.

Supreme Court of Texas.

June 21, 1989.

Rehearing Overruled Feb. 28, 1990.

Dissenting Opinion of Justice Mauzy Feb. 28, 1990.

Linda L. Addison, Sarah B. Duncan, Houston, for petitioners.

George H. Tarpley, David L. Ellerbe, Dallas, for respondent.

OPINION

PHILLIPS, Chief Justice.

The principal issue in this case is how to calculate the deficiency or surplus after foreclosure of a mortgage securing a "wraparound note." The trial court held that the sale price should be credited against the outstanding balance of the note. The court of appeals held that the sale price should be credited against only that portion of the note which exceeds the

outstanding balance of the underlying, or "non-wrapped," debt. 737 S.W.2d 327. For the reasons discussed herein, we reverse the judgment of the court of appeals and affirm the judgment of the trial court.

## Facts

Consolidated Capital Special Trust (Consolidated) acquired an apartment complex at a foreclosure sale in Harris County. The defaulting owner was Robert Sill, who had borrowed money from Consolidated and executed a note to it in the principal amount of $6,289,000. This note was secured by a deed of trust on the property. Sill had purchased the property from English Village Apartments, Ltd. (EVA), executing a so-called "wraparound note" to EVA for the principal sum of $4,700,000. Under wraparound financing, the purchaser makes an installment note which includes, or "wraps around," the principal balance of an underlying indebtedness. The purchaser expressly does not assume responsibility for the underlying indebtedness, and he accepts title subject to the lien or liens which secure payment of that underlying indebtedness. While Consolidated's eventual default gave rise to this suit, it is Sill's note to EVA (Sill note) and the deed of trust securing it which we must interpret in this case.

In this case, the Sill note "wrapped" or included the unpaid principal balances of four pre-existing notes.[1] To secure the Sill note, Sill executed a deed of trust in favor of James M. Summers, Trustee. That deed of trust was executed "for the purpose of securing the payment of that certain one note ... for the principal sum of Four Million Seven Hundred Thousand and No/100 Dollars with interest on past due principal and interest at the rate provided therein...." Upon default, the trustee was empowered to sell the property se-

cured by the deed of trust with the proceeds to be applied as follows:

> [T]he Trustee shall first pay all expenses ..., and shall next apply such proceeds toward the payment of the *indebtedness secured hereby* (principal, interest [and] attorney's fees, if any), and the remaining balance, if any, shall be paid to Grantors, their heirs and assigns.

The note, in turn, provided that the "indebtedness secured by this note is secured by," among other items, the deed of trust.

On October 1, 1983, the Sill note became due and owing. Consolidated failed to pay, and the trustee proceeded to foreclose upon the underlying property. As required by the deed of trust securing the Sill note, the notice of sale expressly set forth that the sale would be "subject to" the prior notes and the prior liens. At the foreclosure sale on June 5, 1984, EVA bid $2,750,000. No other bids were received.

The question for our determination is whether EVA's bid resulted in a deficiency against, or generated excess proceeds for the benefit of, Consolidated. EVA maintained that a deficiency was created because the amount bid ($2,750,000) was less than the "outstanding balance" of principal and interest owed by Consolidated on the Sill note ($6,206,952). Consolidated alleged that excess proceeds were generated because the amount bid at the foreclosure sale was greater than what it termed the "true debt", or the amount by which the total outstanding balance due on the Sill note exceeded the balance due on the underlying obligations. Consolidated brought suit for this alleged surplus against EVA and the trustee, who in turn counterclaimed for a deficiency judgment and for post-foreclosure rents allegedly collected by Consolidated prior to foreclosure.

1. In order of priority, the liens encumbering the property were:

| Lien | Mortgagee | Original Principal Sum |
|------|-----------|------------------------|
| 1 | John Hancock | $2,450,000 |
| 2 | Gaslight Square (Wrapped 1st lien) | 2,775,000 |
| 3 | Manchester Group (Wrapped 1st and 2nd lien) | 3,250,000 |
| 4 | RAIA | 500,000 |
| 5 | EVA (Wrapped 4 prior liens) | 4,700,000 |

The trial court granted summary judgment for EVA and the trustee, awarding a deficiency judgment after the foreclosure sale together with rents. The court of appeals reversed and rendered judgment for Consolidated, holding that EVA's bid resulted in a surplus for Consolidated and that EVA had not perfected its claim for rents. We reverse.

### Application of Proceeds

In deciding how to apply the proceeds from the foreclosure sale, the parties advocate two very different methods of calculation: the "true debt" method and the "outstanding balance" method.

The "true debt" approach argues that since the maker of a wraparound note did not accept responsibility for any underlying indebtedness when purchasing the property, he should not be responsible for that portion of the wraparound note which includes those debts. The underlying indebtedness remains the responsibility of those who incurred it and remain liable thereon; the maker of the wraparound note should be liable only for the actual amount of money advanced or credit extended to him by the holder of the note.

The facts of this case show the fallacy of this position. By contract, Consolidated promised to pay $4,700,000 plus accrued interest to EVA. Under the "true debt" approach, however, Consolidated would owe that purchase price only if it decided to make all payments in full on its installment note. If it ever decided to default on the contract, it would only owe the amount by which the outstanding balance on its contract exceeded the amount of the underlying notes. In applying the "true debt" analysis to this case, the court of appeals found that difference to be $2,212,686, so that EVA's bid of $2,750,000 for the property resulted not in a deficiency for the additional amount owed under the contract, but in excess proceeds to Consolidated of more than $500,000. By defaulting on its

agreement, Consolidated not only managed to avoid any further obligation to EVA, but obtained a windfall profit as a reward for its breach.

In adopting the "true debt" approach, the court of appeals confused the purchaser's personal liability on the seller's prior notes with the purchaser's obligation to pay for the property pursuant to the express terms of its own agreement. It is true that Sill (and subsequently Consolidated) did not agree to assume liability for the balance of the underlying four prior mortgages. That is, they did not become guarantors of that debt, additional makers on those notes, or undertake any other obligation which would render them legally liable to the holders of those earlier obligations.[2] The holders' only legal recourse was to look to their respective makers who executed those notes, not to Sill or Consolidated. But this reservation in no way affects Sill's (and subsequently Consolidated's) obligation to EVA for the entire amount of the fifth note. This transaction was made "subject to" the prior notes and liens because the prior notes and liens would continue to encumber the property following a sale. *See Taylor v. Brennan*, 621 S.W.2d 592, 593 (Tex.1981). It was not made subject to the prior notes and liens because the prior lienholders were to share in the current purchase obligation.

Consolidated also points to the power of sale clause in the deed of trust, claiming it restricts the power of the trustee to pay off the prior senior liens. The clause provides:

> With the proceeds arising from such sale or sales, the Trustee shall first pay all expenses of advertising, sale and conveyance, including a commission of 5% of the gross proceeds of such sale or sales to the Trustee acting, and shall next apply such proceeds toward the payment of the indebtedness secured hereby (principal, interest [and] attorney's fees, if any), and

2. The deed of trust executed by Consolidated provides in part as follows:
> The Grantors have accepted the conveyance of the ... property subject to the Prior Notes and to the Prior Liens, to the extent and only

to the extent set forth in the Deed, and Grantors have in no way assumed or agreed to pay or to become personally liable for any of the indebtedness evidenced by the Prior Notes.

the remaining balance, if any, shall be paid to Grantors, their heirs and assigns. We see no such restriction in this clause. We recognize that if the foreclosing wrap note holder failed to apply excess proceeds to the pre-existing debt, a purchaser at foreclosure might have to pay twice to satisfy those upstream obligations and obtain clear title. Absent an express agreement between the purchaser and wrap note holder, the law should imply a covenant into the parties' agreement requiring the trustee to apply the proceeds first to the satisfaction of pre-existing debt before making any distribution to the mortgagor. See J.M. Realty Inv. Corp. v. Stern, 296 So.2d 588, 589 (Fla.Dist.Ct.App.1974). Texas law permits the insertion of an implied covenant when necessary to effectuate the parties' actual intent. As this court said in Danciger Oil & Ref. Co. v. Powell, 137 Tex. 484, 490, 154 S.W.2d 632, 635 (1941):

[C]ovenants will be implied in fact when necessary to give effect to the actual intention of the parties as reflected by the contract ... as construed in its entirety in the light of the circumstances under which it was made and the purposes sought to be accomplished thereby.

Henceforth, such a clause, if not expressly set forth, will be implied in every power of sale clause in a wraparound deed of trust in this state.

■ We therefore adopt the "outstanding balance" method of calculation, as have the other courts that have considered this question. See J.M. Realty Inv. Corp. v. Stern; Armsey v. Channel Asso., Inc., 184 Cal.App.3d 833, 229 Cal.Rptr. 509 (Cal.Ct. App.1986). Thus, when a deed of trust lien securing a wraparound note is foreclosed, the amount bid for the property at the sale, net of expenses, is to be credited to the entire outstanding balance, including wrapped indebtedness, due on that note. If the bid exceeds such balance, a surplus results; if the balance exceeds the bid, a deficiency results. The trustee acting for the note holder is obliged by implied covenant to apply the net sales proceeds to discharge the entire wrapped indebtedness reflected in the note to the fullest extent possible. The trustee's breach of his obligation to so apply the net sales proceeds does not impair prior, undischarged liens.

### Rents

■ Prior to the June 5, 1984 foreclosure, Consolidated collected rents for the entire month of June. On the day of foreclosure, EVA took possession of the property and purchased it at a foreclosure sale. EVA then brought an action seeking to collect the rent proceeds from Consolidated, claiming that the rentals had been assigned to EVA as security under the deed of trust. Consolidated asserted that EVA failed to take the necessary steps to collect the rents. The trial court granted summary judgment for EVA, awarding it $66,917.00 for both rents and security deposits.

Texas law addressing rentals assigned as security states that an assignment of rentals does not become operative until the mortgagee "obtains possession of the property, or impounds the rents, or secures the appointment of a receiver, or takes some other similar action" following a mortgagor's default. See Taylor v. Brennan, 621 S.W.2d 592, 594 (Tex.1981). The court of appeals, holding that as a matter of law EVA was prohibited from collecting the disputed rents, stated that "EVA took no affirmative steps pursuant to its right of entry" following Consolidated's default. 737 S.W.2d at 333.

As to rents, it is difficult to imagine what EVA could have done beyond foreclosing on the property, purchasing it at the sale and promptly taking possession of it. The trial court was correct in awarding EVA as a matter of law the rents collected prior to the foreclosure but attributable to a time after the foreclosure. We therefore reverse the judgment of the court of appeals. The cause is remanded to the trial court for a determination of the amount of rents to be awarded. Findings are necessary on this issue because EVA subsequently abandoned its claim for security deposits. The trial court is directed to render judgment in accordance with this opinion.

MAUZY, J., files a dissenting opinion in which SPEARS and RAY, JJ., join.

## ON MOTION FOR REHEARING

MAUZY, Justice, dissenting.

The Court has decided to require the use of the outstanding balance method in calculating the deficiency or surplus after foreclosure of a mortgage securing a "wrap-around note." Because I believe that the express terms of the contract dictate that the maker of the wrap-around note should be liable only for the actual amount of money advanced or credit extended to him by the holder of the note, I dissent.

In determining the issues in this case, it is helpful to examine the nature and purpose of wrap-around financing. Although referred to as a "new" or recent trend in real estate financing, *see* Annotation, *Validity and Effect of Wrap Around Mortgages Whereby Purchaser Incorporates into Agreed Payments to Grantor Latter's Obligation on Initial Mortgage*, 36 A.L.R. 4th 144, 148 (1985), the wrap-around mortgage emerged in the 1930s. Gunning, *The Wrap–Around Mortgage ... Friend or U.F.O.?*, 2 Real Estate Rev., Summer 1972 at 35; Comment, *The Wrap–Around Mortgage: A Critical Inquiry*, 21 U.C.L.A. L.Rev. 1529, 1529 (1974). Identified with periods of high interest rates and a tight money market, Comment, 21 U.C.L.A.L. Rev. at 1529, the wrap-around mortgage recently gained new-found popularity because it generates an increased loan yield for lending institutions. R. Kratovil & R. Werner, *Real Estate Law*, 379 (1988). At the same time, the borrower achieves an overall lower financing cost. Other advantages envisioned in the wrap-around mortgage include assorted tax benefits and

avoidance of acceleration under a due-on-sale clause contained in senior mortgage notes. Nevertheless, earlier critical inquiries question the actual existence or legality of these envisioned benefits. Critics pointed out that the uncertainty surrounding wrap-around financing made reliance on such benefits speculative at best. Comment, 21 U.C.L.A.L.Rev. at 1531.

### Intentions of the Parties

Because wrap-around mortgage transactions exist without the benefit of legal construction and interpretation, parties entering into such agreements do so at a considerable risk.[1] *See* Comment, 21 U.C.L.A.L. Rev. at 1531 (1974). Due to the dearth of authority in this area and the limited applicability of the few available authorities,[2] I would apply general rules of construction in this case to determine the correct calculation of the foreclosed indebtedness and the appropriate credit bid. Any attempt to ascertain the obligations of the parties should begin with an examination of the terms of the wrap-around note and deed of trust. Such an examination should be made in light of the nature of the wrap-around mortgage transaction itself. These instruments were contemporaneously executed and therefore must be read together. *Bennett v. State National Bank of Odessa*, 623 S.W.2d 719 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). Generally, in the absence of ambiguity, the agreement contained in a note and deed of trust must be strictly construed and express provisions cannot be altered by equitable considerations. *Chapa v. Herbster*, 653 S.W.2d 594, 602 (Tex.App.—Tyler 1983, no writ); *Lockwood v. Lisby*, 476 S.W.2d 871 (Tex.Civ.App.—Fort Worth 1972, writ ref'd n.r.e.). I would therefore employ general rules of construction in determining the

---

1. The best way to avoid this risk would be to take the advice proffered by Polonius to Laertes, "neither a borrower nor a lender be." W. Shakespeare, *Hamlet, Prince of Denmark* Act I, Scene III (Avenel Books ed. 1975). Also the parties could have avoided these risks by undertaking a safer, more certain means of financing the transaction.

2. Other states' interpretations of wrap-around transactions were in each case governed by the terms of the applicable wrap-around documents. Appropriately, these opinions are inherently limited to their own specific clauses, such as the Maryland court of appeals' construction of a "subject to" clause in *Daugharthy v. Monritt Assoc.*, 293 Md. 399, 444 A.2d 1030 (1982), provides persuasive authority in cases interpreting similar provisions.

intent of the parties, and thereby clarify their corresponding rights and liabilities.

Petitioner, EVA, contends that from the clear terms of the note, Consolidated was obligated to pay the full wrap-around "indebtedness" of approximately $6.2 million. The note refers to the original principal balance of $4.7 million plus accrued interest as the "indebtedness" secured by the deed of trust. The deed of trust likewise provides that, in the event of default and foreclosure, the trustee should apply the proceeds to the balance of the "indebtedness." Again, the principal sum of $4.7 million plus applicable interest is specifically referenced as the "indebtedness."

Unless these documents contain additional specific language illustrating that the parties intended a different result, the clear terms of the Note and Deed of Trust support the contentions advanced by EVA. It is well documented among the scarce authorities addressing this area of mortgage financing that the deed of trust should expressly provide the proper procedures for declaring a default and conducting the trustee's sale. *Armsey v. Channel Associates, Inc.*, 184 Cal.App.3d 833, 229 Cal.Rptr. 509 (Cal.Ct.App.1986); *J.M. Realty Investment Corp. v. Stern*, 296 So.2d 588 (Fla.Dist.Ct.App.1974). In fact, recent commentaries contain examples of express language that would avoid the quandary facing the parties in this case.[3]

As a fundamental component of the complex structure of a wrap-around note, the issue of primary liability becomes a factor in determining the rights of the parties upon foreclosure of the deed of trust. Although the wrap-around note includes the principal amount of the underlying senior notes, the maker of the wrap-around note (the purchaser) usually does not assume primary liability for this underlying indebtedness. The wrap-around note holder (the seller) is obligated to pay the underlying indebtedness, for which the seller is primarily liable, from the payments made to him by the purchaser. At this point the purchaser owns the property, encumbered by the wrap-around deed of trust and the senior lien deeds of trust (upon which the purchaser is not primarily liable). *See generally* M. Baggett, *Texas Foreclosure* § 2.87C (1988 Supp.).

The issue of primary liability is also significant in determining the outcome of the companion case of *Lee v. Key West Towers, Inc.*, 783 S.W.2d 586 (Tex.1989). However, it is of paramount importance in this case to determine the maximum credit allowed upon foreclosure of an inferior wrap-around mortgage. I would hold that, where the purchaser does not assume primary liability for the wrapped indebtedness, the seller remains liable for the underlying senior debt even after foreclosure of the inferior lien. After foreclosure of a wrap-around mortgage, the property remains encumbered by the prior superior liens. When a lien is foreclosed, all inferior liens are thereby extinguished. However, any senior encumbrances remain valid and enforceable against the property. If a junior lien is foreclosed, but senior liens remain outstanding, the purchaser at the trustee's sale should tailor his or her bid to accommodate the balance due on the senior lien debt. Accordingly, the purchaser would calculate his bid by subtracting the amount owed on the senior debt from the fair market value of the property. *See* Baggett, *Texas Foreclosure* § 2.63 (1984). This practice is consistent with the appar-

---

**3.** See e.g. Bentley, "The Wrap–Around Mortgage: Analyzing and Documenting," Advanced Real Estate Law Course, State Bar of Texas, Volume 2 (May 1986). Bentley suggests that the following recital should be included in the trustee's deed if the purchaser's bid reflects consideration for taking the property "subject to" the underlying liens:

"The undersigned, as Substitute Trustee, did on the ___ day of _____, 19___, sell the Mortgaged Premises at a public sale, at the courthouse door of _____ County, Texas, to

_____ ("Grantee"), being the highest bidder, for the sum of $_____ [gross price] of which the sum of $_____ [prior mortgage balance] is represented by Grantee's acceptance of the Mortgaged Premises subject to the prior mortgage documents described in Exhibit B hereto."

Bentley adds, "[T]his type of recital seems to achieve the effect of a 'net' bid, but should make it clear that the total amount of the bid is the credit to be given against the note being foreclosed." *Id.* at 61.

ent intentions of the parties as expressed in the "subject to" language and in the wrap-around mortgagee's personal liability on the underlying debt. The majority holds that the full balance was the amount foreclosed upon and thus a deficiency remains. However, in this case, such an interpretation is negated by the express terms of the deed of trust. The power of sale in the deed of trust restricts the trustee's power to sell the property. The trustee is only authorized to foreclose on the property to discharge the fifth lien. There is no express authorization to pay off or otherwise affect the prior senior liens. The sale must be conducted in strict conformity with the power of sale provisions. *Houston First American Savings v. Musick*, 650 S.W.2d 764, 768 (Tex.1983). In *J.M. Realty Investment Corp. v. Stern*, 296 So.2d 588 (Fla. Dist.Ct.App.1974), the Florida District Court of Appeals also concluded that a more equitable result was reached by allowing foreclosure of the total wrapped indebtedness and requiring that the foreclosing mortgagee apply the proceeds to the underlying debt. 296 So.2d at 589. However, in adopting such a result the court clearly departs from settled case law as well as the express terms of the deed of trust.

The majority's "outstanding balance" approach results in an unconscionable windfall to the wrap-around mortgagee, and a corresponding detriment to the wrap-around mortgagor, under any "real world" foreclosure scenario. For example, if EVA had bid a low amount at the foreclosure sale, say $50,000, then the deficiency owing to it by Consolidated would be $6,156,952. This bid would be credited against EVA's debt, and EVA would own the property subject to underlying debts of $3,994,266. In other words, EVA would own the property, subject to the same underlying debt with which it was burdened at the time of the wrap-around transaction, but *in addition* EVA would have a deficiency judgment against Consolidated. This would be a huge windfall for EVA.

Because I believe that the court's interpretation violates the express terms of the

deed of trust, and the intentions of the parties, I dissent.

SPEARS and RAY, JJ., join in this dissent.