HANCE V KINCAID



NO. 07-01-0100-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL C



FEBRUARY 21, 2002


______________________________



HANCE, SCARBOROUGH, WRIGHT, GINSBERG & BRUSILOW, L.L.P.,

 fka HANCE/SCARBOROUGH/WRIGHT, by and through 

EDWARD W. CALLISON, JR. AND BECKY S. CALLISON,

 


 Appellant


v.



AUBREY A. KINCAID, 




 Appellee

_________________________________



FROM THE 46th DISTRICT COURT OF HARDEMAN COUNTY,


NO. 9203; HON. TOM NEELY, PRESIDING


_______________________________



Before QUINN, REAVIS AND JOHNSON, J.J.

 Hance, Scarborough, Wright, Ginsberg & Brusilow, L.L.P., (Hance) appeal from a
judgment awarding interpled funds to Aubrey A. Kincaid (Kincaid). The trial court allegedly
erred in awarding the entire fund to Kincaid because it incorrectly interpreted a promissory
note and failed to abide by applicable bankruptcy laws, contends Hance. We reverse.

Background

 The facts involved are not disputed. They reveal that on February 23, 1994,
Edward and Becky Callison (Callisons) purchased the Quanah Parker Inn (Inn) from
Quanah Hospitality Inns, Inc. (QHI) and executed a promissory note in the amount of
$308,240.00 (QHI Note) payable to QHI. The QHI Note was secured by a deed of trust
wherein James A. Showers (Showers) was named trustee. On same day, the Callisons
sold the Inn to Robert and Laurie Wright (the Wrights). As part of that transaction, the
Wrights executed a wraparound promissory note (the Wright Note) for $373,510.00,
naming the Callisons and Kincaid payees. The Wright Note read, in pertinent part, as
follows:

 For Value Received, we promise to pay to Edward W. Callison and . . .
Becky S. Callison, and Aubrey Kincaid or order, the sum of Three hundred,
seventy-three thousand five hundred ten and No/100 Dollars ($373, 510.00),
with interest form date at the rate of 10% per annum, both principal and
interest payable at Quanah, Hardeman County, Texas. 


 The principal and interest shall be due and payable in monthly installments
of Four thousand and No/100 Dollars ($4000.00) or more each, payable on
the 23rd day of each and every calendar month, beginning March 23,1994,
and continuing regularly until the principal and interest have been paid in full
. . . .


 The vendor's lien and deed of trust lien securing this note are subordinate,
secondary and inferior to the vendor's lien and deed of trust lien securing the
payment of the unpaid balance of that certain $308,240.00 indebtednessdescribed in and secured by a deed of trust of even date . . . payable by
Edward W. Callison and . . . Becky S. Callison, to [QHI] . . . the payment of
which indebtedness the Makers hereof have not assumed but which the
payees herein, as well as any other owner or holder of this note, are
obligated to pay as and when due, and should default be made in the
payment thereof, the undersigned Makers are accorded the right to cure
such default and receive credit on this note . . . .


 This note, in the original principal sum of $373,510.00 as aforesaid, is
payable to Aubrey Kincaid to the extent of $63,099.47, together with interest
thereon at the rate specified. By their acceptance of this note, Edward . . .
and . . . Becky . . . Callison[] acknowledge that the said Aubrey Kincaid is
entitled to the proportionate payment from the proceeds of this note herein,
to the said extent of $63,099.47, together with interest thereon as
hereinabove specified. The said Aubrey Kincaid, however, is not obligated
or liable with respect to the aforesaid original promissory note in the amount
of $308,240.00, and is not a party to said obligation, and the said parties
acknowledge that Edward . . . and Becky . . . Callison, and Aubrey Kincaid
have entered into a separate agreement of even date . . . reciting the
considerations and conditions entitling the said Aubrey Kincaid to
proportionate payment hereunder.


 It is stipulated and agreed that the monthly payments of $4000.00 each to
be made by Robert . . . and . . . Laurel Wright . . . shall be paid directly to
[QHI] in accordance with instructions to be furnished in writing by the parties,
until such time as the said payors are otherwise lawfully instructed in writing.


As revealed by the terms of the note, the Wrights also executed a deed of trust securing
payment of the Wright Note. The beneficiaries named in the encumbrance were the
Callisons and Kincaid. 

 Several years later, the Callisons filed for bankruptcy under Chapter 11 of title 11
of the United States Code. Hance expended effort in relation to the bankruptcy. The
record does not describe the nature or extent of that relationship, however. Nevertheless,
the firm made claim for $58,115.66, and it was granted the status of an administrative
claim in the modified plan of reorganization. (1) Through that plan, the bankruptcy court
ordered that the ". . . Fee Claims of [Hance] shall receive the following payments until such
Professional Fee Claims are paid in-full."

 1) monthly payments out of future operations in an amount to be agreed on
with the Debtors; 2) the first Net Recoveries from the Retained Actions and
any liquidations of the Quanah Note [or Wright Note], after associated costs,
but prior to the payments of Net Recoveries to Priority Tax Claims,
Unsecured Creditors and the Debtors, and; Net Recoveries from any sale of
the Rodeway Inn Property, after payment of closing costs and after payment
of Graham Savings, but prior to payment of Net Recoveries to Priority Tax
Claims.



 Thereafter, the Wright's defaulted upon their obligation represented in the Wright
Note. The Callisons and Kincaid foreclosed upon the deed of trust securing the obligation
and bought the property at the foreclosure sale for $372,500.00. In turn, the Callisons
defaulted upon their indebtedness to QHI, and the latter foreclosed upon its deed of trust. 
At the latter sale, Kincaid purchased the property for $326,000.00. After payment of the
outstanding debt and the deduction of expenses, the sum of $53,555.64 remained. (2) And,
it was this sum which was interpled into the trial court's registry. 

 Upon initiation of the interpleader, Hance moved the bankruptcy court which
originally entertained the Callison bankruptcy proceeding for an order directing that the
interests of the Callisons in the funds be turned over to a receiver. The court granted
same and entered an order declaring that "Bill Siegel, Esq., . . . shall be and hereby is
appointed receiver . . . of the Callisons' interests, cause(s) and chose(s) of action in the
Excess Funds . . . ." So too did it order that 

 [1] the Receiver shall possess the sole and exclusive right to do any and all
acts necessary to pursue the subject interest(s), cause(s) or chose(s) in
action of the Callisons' in the Excess Funds on behalf of [Hance] and/or
collect and receive any portion of the Excess Funds due pursuant thereto
without further hearing, approval or order of [the bankrutpcy] Court [and]


 [2] the Callisons, shall be deemed to have turned over all interest(s),
cause(s) of and chose(s) in action and all right, title and interest incident
thereto to the Receiver, and that . . . the Callisons . . . shall turnover same
and any and all settlements, replacements substitutions, products, or proceeds received concerning same to the Receiver, including any and [a]ll
documents or records related thereto within ten (10) days from the date of
this Order. 


Pursuant to the status granted him via the turnover order, Siegel and Hance intervened
and made claim to the interpled funds. Upon trial, however, the entire $53,555.64 was
awarded to Kincaid. 

First Issue 

 Hance initially asserts that the trial court erred in denying it recovery. This is
allegedly so because the trial court misconstrued the terms of the Wright Note. That is,
Hance believes that to the extent Kincaid had an interest in the interpled funds, it mirrored
his interest in the Wright Note. Furthermore, since Kincaid's percentage interest in the
note equaled the ratio of $63,099.47 to $373,510.00 or 16.893%, the amount he should
have received from the interpled funds was $9,047.15. We sustain the argument.

 Standard of Review

 Critical to our resolution of the argument is the interpretation of the Wright Note. 
Simply put, Kincaid may have been a payee of that note. However, it is clear that he was
not entitled to the entire sum owed by the Wrights. This is evinced by those provisions of
the instrument stating that 1) through the original sum of the note is $373,510.00, it
nevertheless "is payable to Aubrey Kincaid to the extent of $63,099.47, together with
interest thereon at the rate specified" and 2) "Edward . . . and . . . Becky . . . Callison[]
acknowledge that . . . Kincaid is entitled to the proportionate payment from the proceeds
of this note herein, to the said extent of $63,099.47, together with interest thereon as
hereinabove specified." (Emphasis added). So, our task is to decide the extent of
Kincaid's interest in the Wright Note. (3) And, to this end, we acknowledge our obligation to
abide by the rules governing the construction of contracts. (4) 

 Of those many rules, the first directs that construing an unambiguous contract
involves a question of law. (5) Borders v. KRLB, Inc., 727 S.W.2d 357, 359 (Tex. App.--Amarillo 1987, writ ref'd n.r.e.). And, because the question is one of law, we need not
defer to any interpretation afforded it by the trial court. Second, the next rule requires us
to give effect to the intent of the parties. Id. In doing so, we must strive to garner that
intent from the language of the contract itself, as opposed to extraneous evidence. Shaver
v. Schuster, 815 S.W.2d 818, 824 (Tex. App.--Amarillo 1991, no pet.). That is, we peruse
the entire agreement to understand, harmonize, and effectuate all its provisions. Questa
Energy Corp. v. Vantage Point Energy, Inc., 887 S.W.2d 217, 221 (Tex. App.--Amarillo
1994, writ denied). So too must we afford the words contained in the document their
plain, ordinary, and generally accepted meaning. Sun Operating, Ltd. v. Holt, 984 S.W.2d
277, 285 (Tex. App.--Amarillo 1998, pet. denied); Phillips Petroleum Co. v. Gillman, 593
S.W.2d 152, 154 (Tex. Civ. App.--Amarillo 1980, writ ref'd. n.r.e.). 

 Finally, in applying the foregoing rules, we may not rewrite the agreement to mean
something it did not say. Borders v. KRLB, Inc., 727 S.W.2d at 359. That we or various
of the parties may dislike its provisions or come to think that something else is needed
matters not. HECI Exploration Co. v. Neel, 982 S.W.2d 881, 888-89 (Tex. 1998). This is
so because parties to a contract are free to select for themselves the terms and provisions
explaining their respective obligations. And, because they select them, they are bound by
their selection. For a court to change the agreement merely because it did not like it, or
because one of the parties subsequently found it distasteful, would be to undermine not
only the sanctity afforded the bond they created but also to risk undue governmental
interference in commercial transactions. With this said, we now turn to the accord at bar.

 Application of Standard

 At the heart of the controversy before us lies the meaning of various pivotal phrases
in the Wright Note. The particular phrases state that "Kincaid is entitled to the 
proportionate payment from the proceeds of this note herein, to the said extent of
$63,099.47, together with interest . . ." and "to proportionate payment hereunder." 
(Emphasis added). On appeal, Kincaid suggests that they mean he is entitled to first
payment of any funds remaining after the $308,240.00 debt to QHI is satisfied. He arrives
at this premise by focusing on the words "proceeds of this note." In his view, the proceeds
are the difference between the total sum the Wrights obligated themselves to pay
($373,510.00) minus the debt owed by the Callisons to QHI ($308,240.00). This must be
so in his estimation because neither he nor the Callisons are entitled "to a single cent from
the Wrights until QHI had been paid in full," and only after satisfaction of the QHI debt
"would the Wrights begin to make their $4,000.00 monthly payment to the payees," Kincaid
and the Callisons. From there, he concludes that he is entitled to $63,099.47 of the
remainder, that being his "proportionate payment." 

 Interestingly, the argument proffered by Kincaid here differs from that uttered below. 
For instance, when asked at trial whether his right to payment of the Wright Note "would
have only come if [the QHI] . . . note and Deed of Trust had paid the motel debt off," he
answered "[n]o, sir." (Emphasis added). So too was he questioned about his interest in
the Wright Note. When asked if he "own[ed] $63,099.00 of the $373,000.00 note," his
reply was "[p]lus interest." Hance later followed that question and answer by asking
Kincaid whether on the date the Wright Note was executed, his "proportion of that note
was sixty-three three seventy thirds." To this, Kincaid said: "I think that's right. I believe
that's what the situation is." Following this query was one concerning the priorities of
payment. That is, inquiry was made into whether the note specified the manner of
payment between he and the Callisons. Initially, Kincaid stated that he did not know if the
note said anything about whether he was to be paid first. Then, he 1) acknowledged that
nothing other than what was in the note and deed of trust addressed "how any proportions"
were to be paid, 2) "assume[d] that [the parties] spelled that out in a note," and 3)
conceded that "the documents speak for themselves to who is owed what . . . ." Arguing
before us that the QHI Note had to be paid first before anyone else could be paid hardly
comports with his contention below that his "right to payment" did not ripen only after
satisfaction of the QHI debt. 

 Nor does the terminology in the Wright Note support the contention Kincaid urges
before us. Though the instrument specifies that the monthly payments of $4,000.00 were
to be made to QHI, the Wrights were bound by that directive only until the parties (Kincaid
and the Callisons) "otherwise lawfully instructed in writing." Furthermore, nothing in the
instrument itself limited the ability of Kincaid or the Callisons to redirect the monthly
payments to other recipients, including Kincaid and the Callisons. That the payments
could be redirected away from QHI, fails to evince an intent on behalf of Kincaid or the
Callisons that payment of the QHI debt was a prerequisite to their enjoyment of any
proceeds from the Wright Note. Simply put, having the ability to redirect payment to
themselves rebuts the notion that "the express terms of the Wright Note do not entitle
either Kincaid or the Callisons to a single cent from the Wrights until QHI had been paid
in full."

 Similarly, absent from the Wright Note is language specifying that Kincaid was to
receive priority over the Callisons when it came to payment. At best, the instrument
discloses that he is to simply receive a "proportionate" share of the "proceeds" up to
$63,099.00 plus interest. Moreover, "proportionate" connotes "being in proportion" or
being a "part considered in relation to the whole," The American Heritage Dictionary,
1049 (New Coll. Ed. 1976), or "the relation of one part to another or the whole with respect
to magnitude, quantity or degree . . . ratio." Webster's Third New International
Dictionary 1819 (1993). In other words, a proportionate part of something means the size
of the claimant's share in relation to the whole. It has nothing to do with priorities among
the shares of the claimants. And, nothing in the instruments themselves urge otherwise. 
So, unless we ignore the rule of construction obligating us to afford words their plain
meaning, we cannot hold that the phrase "proportionate payment" evinces an intent to
prioritize the right of Kincaid to payment over that of the Callisons.

 Next, in determining what was meant by "proportionate payment," we again turn to
the language incorporated into the Wright Note. In the latter, the parties expressed that
the "original principal sum" of the instrument was $373,510.00. So too did they specify that
"the note" (having such an "original principal sum") was "payable to . . . Kincaid to the
extent of $63,099.47," plus interest and that the Callisons "acknowledged that . . . [he was]
entitled to the proportionate payment from the proceeds of this note . . . ." (Emphasis
added). As previously mentioned, Kincaid would have us believe that the "proceeds"
alluded to equated the difference between the face amount of the Wright Note and the
debt owed QHI. That difference approximated $65,000.00. So, his proportionate share
of those proceeds was represented by the ratio of 63 (i.e., $63,099.47) to 65 ($65,000.00). (6) 
 The flaws in his logic, however, are several. 

 First, Kincaid conceded at trial that the elements comprising the ratio differed
somewhat. He did not argue below that they consisted of 63 and 65. Rather, he
acknowledged under cross examination that they were 63 to 373. This was so (as
explained by Hance via his questioning) because the amount which the Wrights obligated
themselves to pay was $373,510.00, not simply $65,000.00. Second, there could be no
other correct answer given the terms of the note. This is so because the "note" was
payable to Kincaid to the extent of $63,099.47. And, in stating that the "note" was payable
to Kincaid, the expressed language of the instrument falls short of evincing that the parties
intended to mean that only $65,000.00 was payable to Kincaid up to $63,099.47. Any
conclusion to the contrary would simply eviscerate that part of the note specifying that it
had an "original principal sum" of $373,510.00. (7) 

 Third, while it may be that QHI was to receive the $4000.00 monthly payment, that
obligation imposed upon the Wrights was dependent upon the directives of Kincaid and
the Callison. As discussed above, nothing in the instrument barred either payee from
altering that designation at will. And, to the extent that some other agreement may have
done so, we cannot consider it given the rules applicable to construing an unambiguous
document. So, the existence of this right to dictate and change the identity of the recipient
of the monthly payments and the absence of any prohibition barring them from designating
themselves as the recipient dispels the notion that the named payees were lawfully
precluded from recovering more than $65,000 of the $373,510 "original principal sum."

 Nor can it be said that the plain meaning of the word "proceeds" connotes the
difference between the "original principal sum" of the Wright Note and the amount of the
QHI debt. One source defines it as "the net sum brought in after deduction of any discount
or charges," the "total amount brought in," and "what is produced by or derived from
something by way of total return." Webster's Third New International Dictionary 1807. 
 Another interprets it as meaning "profit" or "yield." The American Heritage Dictionary,
1043. Applying these meanings to it, we conclude that the "yield," "profit," or "total amount
brought in" equaled $373,510.00, plus whatever interest the Wrights agreed to pay. This
is so because that is the sum which the Wrights obligated themselves to pay, irrespective
of who ultimately receives their payments. So too was that the sum which both the
Callisons and Kincaid undoubtedly intended for the Wrights to pay. In other words, and
unless the instrument were sold at a discount to some third money, the total amount of
funds which the parties expected to be generated from by engaging in their commercial
transaction (assuming the Wrights paid the note according to its terms) was $373,510.00,
plus interest, not $65,000.00. 

 Similarly, had the Wrights defaulted upon the obligation, the payees would have
been entitled to sue them to enforce the instrument. Furthermore, the amount of principal
due and recoverable would have equaled $373,510.00, less any payments made to reduce
the principal. The Wrights could not have rationally argued that the extent of the liability
was merely $65,000.00 since that was the amount which would have been left if the QHI
Note was first satisfied. Nor could we reasonably conceive of either the Callisons or
Kincaid conceding that the extent of the debtors' liability under the note was merely
$65,000.00. And, because we could not so conceive of the payees doing so, we are
precluded from holding that the "proceeds" of the note were $65,000.00 as opposed to the
amount the Wrights obligated themselves to pay, i.e. $373,510.00.

 In short, Kincaid's proportionate interest in the note and its proceeds equaled
$63,099.47 of $373,510.00 or 16.893% of the note. Additionally, that percentage of
ownership carried over into the land securing payment of the note once Kincaid and the
Callisons foreclosed upon same. (8)
 And, it again represented Kincaid's percentage of
ownership in the surplus funds remaining after QHI enforced its deed of trust encumbering
the land, foreclosed upon said land, and used the proceeds garnered at the foreclosure
sale to satisfy the debt due it. So, in awarding Kincaid more than his proportionate interest
in the surplus, the trial court misconstrued the terms of the note and erred. 

 Accordingly, we reverse the judgment of the trial court and remand for further
proceedings. (9) 


 Brian Quinn

 Justice


 


Publish
1. The firm of Burke, Wright & Keiffer, P.C., actually was awarded an administrative claim. Since that
occurred, however, Hance subsequently acquired the interests of the Burke firm in the fee through merger
or otherwise. So, for convenience and clarity, we refer to the Hance firm as the claimants at bar. 
2. The sum remaining originally consisted of $37,255.64. However, it was determined that the
substitute trustee had waived his right to a fee of $16,300.00. So, that amount was added to the other for
a total of $53,555.64.
3. Though they disagree upon the percentage, the litigants nonetheless concede that whatever the
percentage of interest Kincaid owned in the Wright Note represents the percentage of interest he owned in
the interpled funds. 
4. A promissory note is nothing more than a contract evincing an obligation to pay money. As such,
the construction of its terms is controlled by the rules generally applicable to interpreting contracts. Amarillo
Nat'l Bank v. Dilday, 693 S.W.2d 38, 41 (Tex. App.--Amarillo 1985, no writ).
5. No one contends that the terms of the Wright Note are ambiguous. Nor do we find them
ambiguous. See Shaver v. Schuster, 815 S.W.2d 818, 824 (Tex. App.--Amarillo 1991, no pet.). 
6. Accepting Kincaid's position would effectively leave the Callisons with an interest of only $2,000.00
in the $373,000.00 note.
7. Indeed, the argument proffered by Kincaid likens to that rejected by the Supreme Court in Summers
v. Consol Capital Special Trust, 783 S.W.2d 580 (Tex. 1989). There, the court was asked to determine
whether a foreclosure via a deed of trust securing payment of a wrap-around note (like that at bar) resulted
in a surplus or deficiency. In attempting to persuade the high court to affirm the intermediate court's
decision, the debtor argued that the "true debt" was actually the difference between the face amount of the
note it signed and the amount of the debt which was wrapped into the note. This was allegedly so because
the note's payor was not liable for the underlying wrapped debt. However, the Supreme Court rejected the
propostion for it ignored the fact that the payor obligated itself to pay the face amount of the note, not the
difference between that sum and the amount of the wrapped debt. Like the debtor in Summers, Kincaid
attempts to persuade us to ignore the amount of the obligation actually incurred by the Wrights. It was not
the difference between the face amount of the note and the sum owed to QHI by the Callisons. It was the
"original principal sum" of $373,510.00. And, to the extent that a note of that amount was payable to Kincaid
(up to $63,099.47) his interest was in the $373,510.00, not the supposed "true debt" of $65,000.00. To hold
otherwise would be to deviate from the teachings of Summer. 
8. Generally, cotenants to whom property is conveyed are presumed to own equal shares. However,
the presumption is rebuttable, and one can rebut same by showing, among other things, that each cotenant
contributed an unequal amount towards its acquisition. This evinces an intent on the part of the contributors
to own the realty in differing proportions. Schroeder v. Todd, 249 Iowa 139, 144, 86 N.W.2d 101, 104 (1957). 
With this in mind, we hold that Kincaid's proportionate interest in the surplus of the proceeds from the QHI
foreclosure equals his interest in the Wright Note. This is so because the parties expressly limited his
interest in that note, and the realty upon which QHI ultimately foreclosed was substituted for the note when
the Callisons and Kincaid themselves foreclosed upon it. So, we have before us evidence rebutting the
presumption of equal ownership. 

9. The Rules of Appellate Procedure generally grant us the authority to enter the judgment which the
trial court should have entered. See Tex. R. App. P. 43.2(c). However, the record illustrates that the
bankruptcy court ordered the Callisons' interest in the surplus funds to be turned-over to a Bill Siegel, Esq.,
"on behalf of" Hance. Nothing of record reflects that this order has been modified in a way permitting
delivery of the interest directly to Hance. Indeed, when a trustee is entitled to recoup funds, one does not
pay them directly to the beneficiaries of the trust. Thus, we remand the cause to the trial court to have it
determine to whom to pay the Callisons' interest.